IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| DIGITAL GENERATION, INC. f/k/a DG FASTCHANNEL, INC., <br><br> Plaintiff, <br><br> v. <br><br> STEVEN W. BROWN, <br><br> Defendant. | Civil Action No.: 3-11-CV-3414-M |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR A
<u>PRELIMINARY INJUNCTION IN AID OF ARBITRATION</u>**

Keith Miles Aurzada
(Texas Bar No. 24009880)
Thomas J. Adair
(Texas Bar No. 24047753)
Bradley Purcell
(Texas Bar No. 24063965)
BRYAN CAVE LLP
2200 Ross Avenue, Suite 3300
Dallas, TX 75201
Telephone: (214) 721-8041
Facsimile: (214) 220-6741

*Pro hac vice submitted for:*

C. Allen Garrett Jr.
KILPATRICK TOWNSEND &
 STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

*Attorneys for Plaintiff Digital Generation, Inc.
f/k/a DG FastChannel, Inc.*

## I. INTRODUCTION

Plaintiff Digital Generation, Inc. f/k/a DG FastChannel, Inc. ("DG") has moved for a injunction in aid of arbitration, describing the irreparable competitive harm it faces from the decision of Defendant Steven W. Brown to leave his position as DG's Senior Vice President Global Operations & Affiliate Relations to become the General Manager of Javelin, LLC ("Javelin") – one of the handful of jobs in the world directly competitive with his prior position at DG. In response, Mr. Brown has raised a host of legal arguments, but steadfastly has avoided denying he is engaging in prohibited competition or solicitation of DG's "Broadcast Destinations" (broadcast affiliates and cable providers who receive digital advertising from DG). These omissions speak volumes regarding Mr. Brown's conduct since he left DG, heightening DG's concerns and confirming DG's urgent need for an injunction pending arbitration.

Mr. Brown's primary challenge is to the specificity of DG's evidence of the confidential information to which he was exposed and the competitive harm posed by his position at Javelin. As with every party seeking to protect trade secrets and confidential information, DG has described the confidential information to which Mr. Brown was exposed generally in its public filings, but will provide specifics regarding this confidential information at the upcoming hearing on DG's motion (which DG has requested the Court to seal). Specifically, DG will have available two of the five remaining "inner circle" of DG senior executives (of which Mr. Brown had been a part) regarding (a) the highly-confidential technical information (of both DG and its Broadcast Destination customers) to which Mr. Brown was privy; and (b) the competitively-valuable sales information to which Mr. Brown was exposed as a result of his promotion and execution of the Employment Agreement. In an effort to streamline the hearing, DG also will provide additional details regarding the non-confidential aspects of Mr. Brown's position via declarations (with the declarants available at the hearing for cross-examination).

Mr. Brown's primary legal challenge to the covenants is predicated on his alleged relocation to California. As Mr. Brown's own declaration confirms, however, he has continued to "commute" from his long-time residence in Tennessee to his new position with Javelin, just as he regularly flew to Texas for years for his position with DG. In any event, his choice-of-law challenge fails, because (a) Texas (DG's headquarters) has a "reasonable relation" to the parties and the Employment Agreement, warranting enforcement of the Texas choice-of-law clause; and (b) the pertinent state "policy" to be examined by this Court is that of *Texas*, not California.

Mr. Brown's challenges to the covenants under Texas law also fail. Although he points to the hypothetical reach of the non-compete, those issues are not relevant to DG's motion here, because Mr. Brown indisputably has taken one of the handful of jobs directly competitive with his prior position with DG. His challenges to the non-solicit rest on the illusory premise that Broadcast Destinations are not "customers" because advertisers actually pay DG. If this argument were accepted, no entity providing advertising-financed content would ever be able to enforce restrictive covenants against employees involved with end-user relationships. Finally, Mr. Brown's challenges to the non-disclosure agreement ignore his fiduciary duties to Javelin, pursuant to which he must use the knowledge he gained from DG for the benefit of Javelin.

Mr. Brown's remaining challenges focus on the financial consequences to him of an injunction against continued employment as compared to the allegedly speculative harm faced by DG. Any harm to Mr. Brown should be minimal, however, because DG has offered (and continues to offer) to arbitrate this matter expeditiously. The harm to DG if an injunction is not granted, on the other hand, is incalculable, as the nature of the industry allows Javelin to become poised to decimate DG's digital advertising delivery business with the flip of a switch.

Accordingly, DG's Motion for Preliminary Injunction should be granted.

## II.     RESPONSE TO MR. BROWN'S FACTUAL BACKGROUND

### A.     Mr. Brown Has Not Established California Residency

In support of his request that this Court ignore the Texas choice-of-law provision in his Employment Agreement, Mr. Brown repeatedly claims he is a California "resident." The only evidence of his residency, however, is Mr. Brown's assertion he has been paying "rent" for an "apartment in California" since November, 2011, mere weeks before DG filed this action.[1]

As Mr. Brown's Declaration makes clear, he has been and remains a Tennessee resident. He presently owns three properties in Tennessee, where his family currently resides. Brown Decl. ¶ 3. Mr. Brown apparently commutes to California during the work week, returning home to Tennessee on the weekends to see his family. *Id.* Mr. Brown had a similar arrangement with DG: he would fly to Dallas and work out of his office in DG's headquarters in Irving several times a month and return home to Tennessee for the weekends. *See* Declaration of Deanna Hovland ¶¶ 8-9 (App.0002). Indeed, Mr. Brown regularly had discussions with DG about relocating with his family to Dallas (*see* Declaration of Jack Reynolds ¶ 17 (App.0017)); it appears Mr. Brown has had similar discussions with Javelin about moving to California. *See* Brown Decl. ¶ 3.

Mr. Brown's current arrangement with Javelin no more makes him a California resident than his prior relationship with DG made him a Texas resident (although Mr. Brown's contacts with both states would be more than sufficient to establish personal jurisdiction for claims arising out of such activities). Mr. Brown is a Tennessee resident who worked in the Texas headquarters

---

[1] Mr. Brown had not produced a California Driver's License and has provided no evidence remotely establishing California "residency" for purposes of such a license under Cal. Vehicle Code § 12505. *See also* Cal. Educ. Code § 68017 (party must reside in California for "more than one year" to be considered a California "resident").

- 3 -

of a Texas-based employer and signed a Texas contract explicitly selecting Texas law. His decision to take a new job requiring a California commute cannot change these undisputed facts.

### B. Mr. Brown's Submissions Confirm He is Competing Directly With DG

Although Mr. Brown purports to establish that he is not competing directly with DG, his own submissions confirm he has taken one of the few jobs in the world directly competitive with his prior position as DG's Senior Vice President Global Support & Affiliate Relations.[2]

Mr. Brown argues he only was involved in the "operational aspects of the business and only had contact with the broadcasters," in support of his contention Broadcast Destinations are not "customers." Brown Decl. ¶ 6. The materials he has submitted, however, describe DG's "*customer* service team dedicated to supporting the needs of *radio, television, and network stations*." Caldwell Decl., Ex. 2, at App. 40 (emphasis added). Indeed, the heart of DG's digital advertising delivery business is "connecting more than 5,000 advertising and advertising agencies with approximately 4,800 television, cable and network broadcast destinations …." App., at 36.[3] Mr. Brown was at the heart of these connections for DG and, now, for Javelin.

---

[2] Mr. Brown's assertion he has only worked for DG since 2008 (Brown Decl. ¶ 5) ignores that DG acquired Mr. Brown's former employer (Vyvx, Inc.) and has treated Mr. Brown as an employee of DG since 1994, when he began with Vyvx. Reynolds Decl. ¶ 24 & Ex. E (App.0018, App.0042). Mr. Brown also asserts he "only" worked in 10 states during his employment with DG. Brown Decl. ¶ 5. The breadth of Mr. Brown's geographic region (which spans the country) confirms the reasonableness of the geographic component of his non-competition covenant.

[3] These materials also confirm that Deluxe (Javelin's co-owner) directly competes with DG in the digital advertising delivery market (*see id.* at App. 41, 45) and that DG's "business and prospects depend in significant part upon the continued service of our key management … and administrative personnel" (*id.* at App. 42). With respect to Mr. Brown's position as head of Global Support, DG warned of the risks attendant to an "inability to maintain the server equipment necessary for the receipt of electronically delivered video advertising content in an adequate number of television stations …." *Id.* at App. 48. With respect to his position as head of Affiliate Relations, DG similarly emphasized the criticality of its relationships in "key market segments, including media broadcasters and digital system providers." *Id.* at App. 22.

Mr. Brown also disavows having received additional confidential information following his promotion to Senior Vice President Global Support & Affiliate Relations in September 2010. Brown Decl. ¶ 8.  As DG already has shown in its Complaint and the Declarations it has submitted, and as will be shown more fully at the hearing on Thursday, Mr. Brown continually was immersed in DG's most competitively valuable information following his elevation to DG's "inner circle" of its six most senior executives.  This knowledge encompassed all facets of DG's business, including competitive strategies specific to Javelin, deficiencies in Javelin's existing technology, and DG's planned mergers and acquisitions.  *Cf.* Caldwell Decl. ¶ 8 & Ex. 6 (App.).

Most telling is what Mr. Brown does *not* state in his declaration.  Far from denying that he has contacted the Broadcast Destinations with which he worked at DG, he claims that Javelin "had already contacted and had relationships with all of the major broadcast and cable networks." Brown Decl. ¶ 17.  Apparently, Mr. Brown does not believe it is a violation of his non-solicit with DG to contact Broadcast Destinations, as long as they also have a relationship with Javelin.

Mr. Brown also emphasizes the "differences" between DG's and Javelin's technology, further noting that Broadcast Destinations are unlikely to "remove a server."  *Id.* ¶ 18.  These assertions cause DG great concern, because they indicate Mr. Brown already has facilitated the deployment of Javelin's competing technology.  Once Mr. Brown has convinced a Broadcast Destination to accept and install Javelin's server – exploiting the relationships and knowledge of the Destination's technical specifications learned while at DG – transferring advertising from DG's to Javelin's server requires only "flipping a switch."  The harm to DG will be difficult if not impossible to notice, because ad revenue gradually will be transitioned away from DG to Javelin. DG's "server" may well remain; but the advertising passing through that server will diminish.

In sum, Mr. Brown does not and cannot dispute he is directly competing with DG in his new position with Javelin. Further, Mr. Brown's own submissions strongly suggest he already had engaged in improper solicitation of DG's Broadcast Destinations. And Mr. Brown fails to ameliorate DG's legitimate concerns he will misuse DG's confidential information for Javelin.

## III.    ARGUMENT AND CITATIONS OF AUTHORITY

### A.    Texas Law Governs Mr. Brown's Restrictive Covenants

The parties' Employment Agreement, made in Texas, provides "[t]his Agreement shall in all respects be subject to, and governed by, the laws of the State of Texas." Compl., Ex. A, at 1 & ¶ 21. Texas courts will enforce a choice-of-law clause unless (1) the contract bears no reasonable relation to the chosen state or (2) the chosen law violates a public policy of Texas.[4]

There is no reasonable dispute that the Employment Agreement bears a reasonable relationship to Texas. The place of contracting is Texas; Mr. Brown traveled to Texas regularly for over two years to attend "meetings and to manage the employees who were based in Texas" (Brown Decl. ¶ 5); and Mr. Brown maintained an office in DG's Irving headquarters. Hovland Decl. ¶ 8 (App.0002). These contacts are more than sufficient to support the selection of Texas law.[5]

---

[4] *AGIP Petroleum Co. v. Gulf Island Fabrication, Inc.*, 281 F.3d 1279, 2001 WL 1692481, at * (5th Cir. 2001) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990)); *Resource Sav. Ass'n v. Neary*, 782 S.W.2d 897, 902 (Tex. App.—Dallas 1989, writ denied) ("When the parties to a contract expressly agree that the contract is to be governed by the law of a particular state, that law will apply if the contract bears a reasonable relationship to the chosen state and no countervailing public policy of the *forum* demands otherwise.") (emphasis in original).

[5] *See, e.g., Transperfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 749-50 (S.D. Tex. 2009) (enforcing Texas choice-of-law provision against non-resident employee); *B.J. Tidwell Indus., Inc. v. Diversified Home Products, Inc.*, No. SA-06-CA-0264 FB (NN), 2007 WL 3377184, at *8 (W.D. Tex. Nov. 11, 2007) (enforcing Texas choice-of-law clause); *D/FW Wheatland Inv., L.P. v. Lehman Bros. Holdings, Inc.*, No. 3-00-CV-2120-BD, 2001 WL 1445950, at *3 (N.D. Tex. Nov. 13, 2001) (enforcing Texas choice-of-law clause).

The selection of Texas law cannot conflict with Texas public policy.[6]  Mr. Brown's inapposite authorities involve the selection of the law of a state other than the forum state.[7]

### B.  The Non-Competition Clause Is Enforceable Under Texas Law

Mr. Brown argues the covenants cannot be enforced under Texas law because they are not directly linked to the consideration DG provided to him under the Employment Agreement. *See* Opp., at 13.  As the Texas Supreme Court recently clarified, however, "there is no compelling logic" for this standard.  *Marsh USA Inc. v. Cook*, No. 09-558, 2011 WL 6378834, at *9 (Tex. Dec. 16, 2011).  Instead, consideration for a restrictive covenant need only be "reasonably related to an interest worthy of protection, ***such as trade secrets, confidential information or goodwill***."  *Id.* (emphasis added).  DG's provision of additional confidential information to Mr. Brown following his most recent promotion easily satisfies this standard.

Mr. Brown also claims the non-compete's scope of activities and geographic restrictions are "unreasonable as a matter of law."  Opp., at 14.  The outer boundaries of the non-compete are not relevant here, however, because Mr. Brown is directly competing against DG itself, in a geographic area in which he admits he "regularly" worked while at DG.  Brown Decl. ¶ 5.  In any event, the arbitrator can modify the covenants as necessary to conform to DG's interests.[8]

### C.  The Non-Solicitation Clause is Enforceable Under Texas Law

---

[6] *See Resource Sav. Ass'n*, 782 S.W.2d at 902 (holding that where Texas is forum of litigation, "by definition" selection of Texas law cannot possibly violate public policy of forum).

[7] *See DeSantis*, 793 S.W.2d at 678 (declining to enforce Florida choice-of-law provision); *Application Grp. Inc. v. Hunter Grp., Inc.*, 61 Cal. App. 4th 881, 895, 72 Cal. Rptr. 2d 73, 81-82 (1st Dist. 1998) (California court declined to enforce Maryland choice-of-law provision).

[8] Texas Business & Commerce Code § 15.51 authorizes the reformation of restrictive covenants that impose a greater than necessary restraint.  *See also Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 794-95 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (affirming trial court's reformation of geographical limitation and scope of activity of covenant not to compete).

As noted above, Mr. Brown does not deny having violated the non-solicitation provision, instead claiming Javelin already "had relationships" with DG's Broadcast Destinations and that such Destinations should not be considered "customers" because they do not pay DG.  Brown Decl. ¶¶ 8, 17.  As DG has explained and will elaborate at the hearing, this argument ignores the nature of the digital advertising delivery industry, in which access to and service of Broadcast Destinations is critical to revenue from the "other side" of the network (*i.e.*, advertisers).  Broadcast Destinations are the flip-side of advertisers; without Destinations to "receive" advertising, revenue from "supplying" advertisers quickly will disappear.  Hovland Decl. ¶ 17 (App.0004).

### D. The Non-Disclosure Clause is Enforceable Under Texas Law

Although Mr. Brown vigorously contests enforcement of DG's non-disclosure provision, he claims in his declaration that "I have not used or divulged to Javelin any confidential information since my resignation from DG, and have no need to use or divulge any of DG's confidential information in my new job at Javelin."  Brown Decl. ¶ 14.  If this statement is true, Mr. Brown should stipulate to the entry of an injunction enforcing the non-disclosure provision.

In fact, Mr. Brown cannot perform his new position at Javelin without exploiting the technical and competitive information to which he gained access at DG.  Mr. Brown was privy not only to detailed technical information relative to DG's products and Broadcast Destinations' specifications (as head of Global Support), he also was immersed in a constant stream of DG's most competitively-valuable information (as head of Affiliate Relations).  Mr. Brown was aware of specific deficiencies in Javelin's prior, unsuccessful technology and participated in planning sessions relative to DG's competition against Javelin.  Mr. Brown cannot fulfill his fiduciary duties as General Manager of Javelin without drawing upon information learned while at DG.

According to Mr. Brown, DG's claim he cannot "unlearn" the competitive information to which he was exposed at DG invokes the "inevitable disclosure" doctrine, which he says has not been adopted by "any Texas court." Opp., at 21. The authority cited by Mr. Brown, however, states that Texas has recognized a "modified version" of the inevitable disclosure doctrine.[9] Pursuant to this doctrine, courts have held an injunction prohibiting a former employee "from using an employer's confidential information is appropriate when it is ***probable*** that the former employee will use the confidential information for his benefit (or his new employer's benefit) or the detriment of his former employer."[10]

Finally, Mr. Brown disputes receiving any confidential information. It is hard to imagine how a top-level executive earning over $200,000 and reporting directly to the President and COO would be sheltered from confidential information. In any event, DG has provided and will provide evidence regarding the confidential information to which Mr. Brown was exposed.

**E. DG Has Satisfied the Remaining Requirements for an Injunction**

In response to DG's citation of authorities finding irreparable injury in former employee disputes, Mr. Brown asserts "the former employees were still permitted to work and earn an income." Opp., at 22-23. All DG seeks in this motion, however, is an injunction against Mr.

---

[9] *See* Opp., at 21 (citing *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 242 (Tex. App.—Houston [1st Dist.] 2003, no pet.)). Although the *Cardinal* court declined to apply the modified inevitable disclosure doctrine, it did so because the employee "did not need to and would not use [the employer's] confidential information, *i.e.*, that disclosure and use was not probable." *Cardinal*, 106 S.W.3d at 243; *see M-I, LLC v. Stelly*, No. H-09-cv-01152, 2009 WL 2355498, at *7 (S.D. Tex. July 30, 2009) (doctrine inapplicable unless employees in a position to use confidential information in new positions). The doctrine still applies where the employee has confidential information and is in a position to use that information in his new position.

[10] *Conley v. DSC Comm'n Corp.*, No. 05-98-01051-CV, 1999 WL 89955, at *4 (Tex. App.—Dallas Feb. 24, 1999, no pet.) (emphasis in original)); *see Transperfect Translations*, 594 F. Supp. 2d at 757 ("Where there is a high degree of similarity between the employee's former and future employer, it becomes likely, although not certain, that the former's confidential information will be used and disclosed in the course of his work").

Brown continuing in one of the handful of positions in the entire world directly competitive with his prior position as DG's Senior Vice President Global Support & Affiliate Relations. Mr. Brown's own authorities recognize such an injunction is appropriate under these circumstances.[11]

Mr. Brown also claims DG failed to show an injunction would not disserve the public interest. Opp., at 23. DG's opening brief, however, quoted the Texas Supreme Court's recognition that enforcement of restrictive covenants furthers Texas's public policy of "'increas[ing] efficiency in industry by encouraging employers to entrust confidential information and important client relationships to key employees'" and "'incentiviz[ing] employers to develop goodwill by making them less reluctant to invest significant resources in developing goodwill that an employee could otherwise immediately take and use against them in business.'" *See* DG's Mot., at 14-15 (quoting *Marsh*, 2011 WL 6378834, at *3). As stated by Mr. Brown's own authorities, "Texas has clarified the public interest through its non-compete statute, and, under that statute, enforcing reasonable non-compete agreements is within the public interest." *Transperfect Translations, Inc.*, 594 F. Supp. 2d at 758.

## IV. CONCLUSION

For the foregoing reasons and the reasons to be stated at the hearing in this matter, DG's Motion should be granted, and Mr. Brown should be enjoined from violating the non-competition, non-solicitation, and non-disclosure provisions of his Employment Agreement with DG until such time as an arbitrator can determine the propriety of continued injunction relief.

---

[11] *See Transperfect Translations, Inc.*, 594 F. Supp. 2d at 757 (potential threat of employee working at "direct competitor" and using his "intimate knowledge" of employer's strategy and marketing outweighed "minimal" injury to employee); *Am. Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996) ("Although this restriction on [employee's] activities will be meaningful and painful, the harm to [the employee] does not outweigh the harm to [the employer] in terms of lost customer goodwill and business.").

Respectfully submitted this 17th day of January, 2012.

    //s// Keith M. Aurazada
Keith Miles Aurzada
(Texas Bar No. 24009880)
Thomas J. Adair
(Texas Bar No. 24047753)
Bradley Purcell
(Texas Bar No. 24063965)
BRYAN CAVE LLP
2200 Ross Avenue, Suite 3300
Dallas, TX 75201
Telephone:  (214) 721-8041
Facsimile:  (214) 220-6741

*Pro hac vice submitted for:*

C. Allen Garrett Jr.
KILPATRICK TOWNSEND &
   STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

*Attorneys for Plaintiff Digital Generation, Inc. f/k/a DG FastChannel, Inc.*

- 11 -

## **CERTIFICATE OF SERVICE**

The undersigned hereby states that on the 17th day of January 2012, a true and correct copy of the foregoing instrument was served *via* e-mail through the Court's ECF system to all parties consenting to service through same in this case.

<div style="text-align: right;">

*//s// Keith M. Aurzada*
Keith M. Aurzada

</div>